In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-4064

GEORGE S. TOELLER,

*Plaintiff-Appellee,*

*v.*

WISCONSIN DEPARTMENT OF CORRECTIONS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-826—**Aaron E. Goodstein**, *Magistrate Judge.*

ARGUED APRIL 4, 2006—DECIDED AUGUST 25, 2006

Before POSNER, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* This case reaches us on an inter-locutory appeal by the Wisconsin Department of Corrections (WDOC), challenging the district court's decision to deny its motion to dismiss based on the State's Eleventh Amendment immunity from suit. Although WDOC acknowledges that the Supreme Court decided in *Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721 (2003), that the family-care provision of the federal Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2602 *et seq.,* validly abrogated the State's immunity, it argues that the self-care provisions of the same statute must be evaluated separately. Once this is done, the State continues, the applicable rule is the one

upholding the State's Eleventh Amendment immunity in a claim under Title I of the Americans with Disabilities Act (ADA), which prohibits discrimination in employment against qualified persons with a disability, 42 U.S.C. §§ 12112(a), 12111(2), (5), (7). *Bd. of Trs. of the Univ. of Ala. v. Garrett,* 531 U.S. 356 (2001). While we consider the question a close one, in the end we agree with our sister circuits that *Garrett* controls the self-care provision, and thus that the State is entitled to immunity here. See *Touvell v. Ohio Dep't of Mental Retardation and Developmental Disabilities,* 422 F.3d 392 (6th Cir. 2005), *cert. denied,* 126 S.Ct. 1339 (2006); *Brockman v. Wyo. Dep't of Family Servs.,* 342 F.3d 1159 (10th Cir. 2003). We therefore reverse.

**I**

In 1996, WDOC hired George Toeller as a Facilities Repair Worker at the Racine Correctional Institution. Two years later, he was transferred to the Racine Youthful Offender Facility. Between that time and 2000, he experienced a number of traumatic events, including the deaths of family members and close friends. He began to suffer from stress anxiety and delusional disorder, which made it impossible for him to work. As of July 2000, he began to receive a series of letters from WDOC charging him with various types of misconduct at the workplace and attempting to schedule a medical evaluation. During this time, Toeller was absent from work frequently; WDOC repeatedly asked him to provide medical certification for those absences, but he did not do so. He did, however, use sick days as WDOC policy required, until he exhausted them. Then, on October 5, 2000, he submitted a request for unpaid leave under the FMLA until October 23, 2000, when his doctor released him to work. WDOC never expressly granted or denied this request, but under its

general policy, leave without pay is granted automatically if it is not expressly granted or denied within two business days.

When Toeller returned to work, on October 23, he was suspended with pay pending an investigation of a variety of infractions of workplace rules. On October 26, 2000, Toeller received a written notice of termination from the Warden, indicating that he was being fired for several reasons: threatening and attempting to inflict bodily harm on another person in July 2000; insubordination; and excessive unexcused absences from work. Toeller claims that these grounds were pretextual and that the real reason he was fired was because he took unpaid medical leave under the FMLA.

On August 29, 2003, he filed a complaint against WDOC in federal court, alleging that WDOC had terminated his employment in violation of the FMLA's self-care provisions, 29 U.S.C. § 2612(a)(1)(D), and seeking money damages. WDOC responded with a motion to dismiss on the ground of the State's Eleventh Amendment immunity from suit. The district court denied that motion. After some discovery, WDOC filed a motion for summary judgment on the merits, in which it again raised its Eleventh Amendment defense. The district court denied the motion, concluding that Congress validly abrogated the State's immunity in the FMLA and thus that the suit could proceed. The State has appealed from the second order denying its immunity defense.

## II

Before considering the merits of WDOC's appeal, we must resolve a preliminary question of appellate jurisdiction. WDOC argues that this court has jurisdiction over the district court's order rejecting its defense, noting that it is established that "States . . . may take advantage of the

collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." *Nanda v. Bd. of Trs. of Univ. of Ill.,* 303 F.3d 817, 821 (7th Cir. 2002) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 147 (1993)). Toeller acknowledges this rule, but he argues that WDOC failed to file its notice of appeal within the time permitted by FED. R. APP. P. 4(a)—a step that is also required before this court may entertain the appeal.

Toeller's position, however, rests on the mistaken premise that WDOC had one and only one opportunity to take an interlocutory appeal on this issue. He believes that this opportunity arose after the district court's initial denial of the State's motion to dismiss, which was docketed on December 23, 2003. But *Behrens v. Pelletier*, 516 U.S. 299 (1999), held to the contrary, in the closely-related area of interlocutory appeals from denials of motions to dismiss on qualified immunity grounds. See *id.* at 307. We see no reason why the rationale of *Behrens* should not apply with equal force to interlocutory appeals of Eleventh Amendment immunity claims. From that standpoint, WDOC's notice of appeal easily satisfied Rule 4(a). The district court denied WDOC's motion for summary judgment (which included its renewed Eleventh Amendment defense) on September 29, 2005, and the State filed its notice of appeal comfortably within the 30-day period allowed by the rule, on October 17, 2005. We conclude that we have jurisdiction over this appeal and thus may proceed to the merits.

**III**

The first question we must reach—and as it turns out the last one—is whether WDOC is entitled to immunity from suit here. That is the question that is properly before us on interlocutory appeal. In addition, state sovereign immunity

is the kind of preliminary question that should be resolved before the merits of the claim.

As the Supreme Court stated in *Garrett,* "[t]he ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by private individuals in federal court. . . . We have recognized, however, that Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and act[s] pursuant to a valid grant of constitutional authority." 531 U.S. at 363 (citations and quotation marks omitted). In a number of cases decided over the last ten years, the Court has upheld the immunity of the states in a variety of settings. See, *e.g.*, *Garrett, supra* (immunity from suit under Title I of the ADA); *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62 (2000) (immunity from suit under the Age Discrimination in Employment Act); *Coll. Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666 (1999) (immunity in suit brought under federal Lanham Act for unfair competition); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44 (1996) (immunity from suit under Indian Gaming Regulatory Act). On the other hand, the Court has rejected immunity claims also, where it has found that Congress validly abrogated the States' sovereign immunity. See, *e.g.*, *Cent. Va. Cmty. Coll. v. Katz,* 126 S.Ct. 990 (2006) (holding that suit to set aside preferential transfer in bankruptcy is not barred by state sovereign immunity, because federal supremacy was part of the original constitutional plan); *United States v. Georgia,* 126 S.Ct. 877 (2006) (holding that Title II of the ADA validly abrogates state sovereign immunity insofar as the lawsuit addresses conduct that actually violates the Fourteenth Amendment); *Tennessee v. Lane*, 541 U.S. 509 (2004) (Title II of the ADA validly abrogates state sovereign immunity); *Tenn. Student Assistance Corp. v. Hood,* 541 U.S. 440 (2004) (bankruptcy court's exercise of its *in rem* jurisdiction to discharge a student loan is not barred by state sovereign immunity);

*Hibbs, supra*, 538 U.S. 721 (2003) (family-care provision of the FMLA validly abrogated the state's immunity).[1]

A number of general principles emerge from this developing jurisprudence. First, the sovereign immunity of the States is a fundamental feature of the constitutional design. Justice Thomas summarized this basic point in *Northern Ins. Co. of N.Y. v. Chatham County, Ga.,* 126 S.Ct. 1689 (2006), a case in which the Court held that counties do not have the right to claim this immunity:

> This Court's cases have recognized that the immunity of States from suit "is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the Convention or certain constitutional Amendments." *Alden v. Maine*, 527 U.S. 706, 713 (1999); see *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55-56 (1996); *Principality of*

[1] These cases, taken as a whole, demonstrate that the Court has taken care to draw important, and sometimes subtle, constitutional lines in this area. Both for that reason, and for reasons requiring basic courtesy to the courts, we find much of the rhetoric in WDOC's brief to be entirely out of line. It is not up to Attorney General Peggy A. Lautenschlager or Assistant Attorney General Richard B. Moriarty to accuse Justices of the Supreme Court of making "remarkably intransigent statements," or to use a disrespectful tone in criticizing dissenting Justices merely for the fact that they wrote a dissent, or to opine about "polarizing declarations." The tradition of writing dissenting opinions has existed in the United States Supreme Court since the beginning of the Republic, and every Justice on the Court avails himself or herself of that privilege when he or she deems it appropriate. Counsel's brief is also less than helpful where it draws bizarre analogies to opinions about the current presence of American troops in Iraq, which has absolutely nothing to do with this case. We trust that the State of Wisconsin will adopt a more appropriate tone in future briefs filed with this court.

*Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934). Consistent with this recognition, which no party asks us to reexamine today, we have observed that the phrase " 'Eleventh Amendment immunity' . . . is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden*, *supra*, at 713.

126 S.Ct. at 1693. The Court has recognized that the constitutional plan includes the power of Congress to abrogate the States' sovereign immunity, "when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Garrett,* 531 U.S. at 363 (quotations omitted). If and to the extent that a congressional enactment meets those criteria, then a private party is entitled to sue the State under the federal law in question. See *United States v. Georgia, supra,* 126 S.Ct. at 881-82.

The Court has found in a number of instances that Congress has satisfied the clear statement rule. See, *e.g.*, *Garrett,* 531 U.S. at 364 (ADA); *Kimel,* 528 U.S. at 73-74 (ADEA). Importantly for the present case, one of those statutes is the FMLA. See *Hibbs,* 538 U.S. at 726. Nothing in that part of *Hibbs* suggests that the Court's ruling covered anything less than the entire statute. We therefore take as established the fact that the FMLA passes that first hurdle.

At least in recent years, since Congress has learned that the Court will be satisfied with nothing less than language that "mak[es] its intention [to abrogate] unmistakably clear," *Kimel,* 528 U.S. at 73 (quotations omitted), application of the clear statement criterion has been relatively straightforward. It is the second inquiry, whether Congress has acted pursuant to a valid grant of constitutional authority, that has been more difficult. One such valid

grant is contained in section 5 of the Fourteenth Amend-
ment, when Congress acts to enforce the substantive
guarantees of that amendment and, if it has acted pro-
phylactically, the legislation exhibits "congruence and
proportionality between the injury to be prevented or
remedied and the means adopted to that end." See *Hibbs,*
538 U.S. at 728 (quoting *City of Boerne v. Flores,* 521 U.S.
507, 520 (1997)); see also *United States v. Georgia,* 126 S.Ct.
at 881.

Although at one point it seemed as if constitutional
provisions added after the effective date of the Eleventh
Amendment, such as the Fourteenth Amendment, were
the only possible source of valid constitutional authority for
Congress, the Supreme Court corrected that impression in
its decision in *Central Virginia Community College v. Katz,*
*supra,* 126 S.Ct. 990. In keeping with the Court's broader
recognition that the Eleventh Amendment neither created
nor limited the States' sovereign immunity, see *Northern*
*Ins., supra,* the Court clarified in *Katz* that other provisions
of the Constitution might also provide a source of authority
for Congress in this area. In *Katz*, the Court concluded that
the Bankruptcy Clause of Art. I, sec. 8, was such a provi-
sion:

> It is appropriate to presume that the Framers of the
> Constitution were familiar with the contemporary legal
> context when they adopted the Bankruptcy Clause—a
> provision [that] . . . reflects the States' acquiescence in
> a grant of congressional power to subordinate to the
> pressing goal of harmonizing bankruptcy law sovereign
> immunity defenses that might have been asserted in
> bankruptcy proceedings. The history of the Bankruptcy
> Clause, the reasons it was inserted in the Constitution,
> and the legislation both proposed and enacted under its
> auspices immediately following ratification of the
> Constitution demonstrate that it was intended not just
> as a grant of legislative authority to Congress, but also
> to authorize limited subordination of state sovereign
> immunity in the bankruptcy arena.

126 S.Ct. at 996. Later in the opinion, the Court made clear that the States had agreed to this part of the constitutional plan when they ratified the 1787 Constitution, just as they agreed to limitations on their sovereignty in 1868 almost eighty years later when they ratified the Fourteenth Amendment:

> Insofar as orders ancillary to the bankruptcy courts' *in rem* jurisdiction, like orders directing turnover of preferential transfers, implicate States' sovereign immunity from suit, the States agreed in the plan of the Convention not to assert that immunity.

*Id.* at 1002.

Although we are thus well aware of the fact that section 5 of the Fourteenth Amendment is not the only possible source of congressional power to abrogate the States' sovereign immunity, we see no other candidate in this case. Neither of the parties has suggested any alternative, nor are we inclined to reach out and propose one on our own. The analysis in *Hibbs* focuses exclusively on section 5 as the relevant provision for purposes of the FMLA. We therefore turn to the analysis of Toeller's FMLA claim on the assumption that it can go forward only if it rests on a valid exercise of section 5 power.

The operative language of the Family and Medical Leave Act, 29 U.S.C. § 2612, protects an employee's right to take leave for several reasons:

> Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
>
> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
>
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

*Id.* § 2612(a)(1). In *Hibbs,* the Supreme Court was concerned with subpart (C), which is known as the family-leave provision. Toeller's case, in contrast, arises under subpart (D), the self-care provision. We must decide here whether that makes a difference in the outcome.

The Supreme Court began its discussion of the FMLA in *Hibbs* with the observation that the statute "aims to protect the right to be free from gender-based discrimination in the workplace." 538 U.S. at 728. It went on to reaffirm that "statutory classifications that distinguish between males and females are subject to heightened scrutiny." *Id.* Such classifications are valid only if they serve important governmental objectives and employ measures that are substantially related to the achievement of those objectives. *Id.* Congress had already reacted to the long history of laws limiting women's employment opportunities with the passage of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), which the Court had upheld as a valid exercise of the section 5 power in *Fitzpatrick v. Bitzer,* 427 U.S. 445 (1976). See 538 U.S. at 729-30. But, the Court observed, "state gender discrimination did not cease." *Id.* at 730. One particular area of concern, about which Congress had extensive information before it passed the FMLA, had to do with the administration of leave benefits. One area where discrepancies were patent had to do with maternity and paternity leaves: 37 percent of surveyed private-sector employers gave maternity leave, but only 18 percent gave paternity leave; the pattern in the public sector was the same. *Id.* This

was explained not by any differential physical needs of men and women, but rather by "the pervasive sex-role stereotype that caring for family members is women's work." *Id.* at 731. Congress also had evidence before it that facially nondiscriminatory leave policies were applied in a discriminatory fashion, again relying on unexamined stereotypes about sex roles. See *id.* at 732. The Court concluded, based on this extensive record, that "the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation." *Id.* at 735.

Importantly for present purposes, the Court went on to explain why it had come to the opposite conclusion with respect to state sovereign immunity in *Garrett* and *Kimel*, which dealt with the ADA and the ADEA, respectively. Neither disability-based distinctions nor age-based distinctions, under the Court's cases, are subject to heightened scrutiny; instead, both are acceptable if the State has a rational basis for its classification. See *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985) (distinctions based on mental disabilities judged under the rational basis test); *Gregory v. Ashcroft,* 501 U.S. 452 (1991) (upholding constitutionality of state law establishing mandatory retirement age for judges using rational basis test). When the rational basis test applies, "Congress must identify, not just the existence of age- or disability-based state decisions, but a 'widespread pattern' of irrational reliance on such criteria." 538 U.S. at 735 (quoting *Kimel,* 538 U.S. at 90). *Kimel* and *Garrett* found no such showing with respect to either the ADEA or Title I of the ADA.

Title II of the ADA was another matter, however, as the Court's later decision in *Tennessee v. Lane, supra,* demonstrated. Title II is about access to public services. In *Lane,* the Court noted that Title II addresses not only irrational discrimination based on disability, but also the enforcement

of a number of other constitutional guarantees that are subject to more searching judicial review, such as the right of access to courts guaranteed by the Due Process Clause of the Fourteenth Amendment, the right to confront witnesses assured by the Confrontation Clause of the Sixth Amendment, and the right to attend court protected by the First Amendment. 541 U.S. at 522-23. Explaining why it upheld Title II of the ADA as legislation that, under those circumstances, validly abrogated the State's sovereign immunity, the Court said:

> Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights. For example, [a]s of 1979, most States . . . categorically disqualified 'idiots' from voting, without regard to individual capacity. The majority of these laws remain on the books, and have been the subject of legal challenge as recently as 2001. Similarly, a number of States have prohibited and continue to prohibit persons with disabilities from engaging in activities such as marrying and serving as jurors. The historical experience that Title II reflects is also documented in this Court's cases, which have identified unconstitutional treatment of disabled persons by state agencies in a variety of settings . . . .

541 U.S. at 524-25 (footnotes and quotations omitted).

We are not the first to be asked to decide, in the light of *Hibbs*, whether the self-care provision of the FMLA is another valid abrogation of the State's sovereign immunity. Both the Tenth Circuit and the Sixth Circuit have concluded, based on the emphasis the *Hibbs* Court placed on the gender-based aspects of the family-care provision and the lack of an analogous rationale for the self-care provision that the States cannot be sued under the latter subsection. See *Touvell,* 422 F.3d at 400-01; *Brockman,* 342 F.3d at

1164. Other circuits, the Sixth Circuit pointed out in *Touvell*, had found that state sovereign immunity applied to the FMLA's self-care provision before *Hibbs* was decided. See 422 F.3d at 397 (citing *Laro v. New Hampshire,* 259 F.3d 1, 17 (1st Cir. 2001); *Lizzi v. Alexander,* 255 F.3d 128, 136 (4th Cir. 2001); *Hale v. Mann,* 219 F.3d 61, 69 (2d Cir. 2000)).

The Tenth Circuit acknowledged in *Brockman* that "[t]here is a colorable argument to the effect that the self-care provision of the FMLA must be viewed as part of the Act as a whole, and that it would therefore be a valid abrogation of states' sovereign immunity." 342 F.3d at 1164. The court rejected that reading, however, because it could not find in the FMLA's legislative history sufficient evidence that Congress was linking the self-care leave provisions to the elimination of gender discrimination. In reading the FMLA that way, both the Tenth Circuit and the Sixth Circuit implicitly decided that the Supreme Court would be willing to evaluate the statute not only on a title by title basis, as the Court had done with the ADA in *Garrett* and *Lane,* but on a subsection by subsection basis.

The message that we derive from the many Supreme Court decisions in this area is that we should—indeed must—look at each provision of the law separately, even though we should also evaluate each provision in context. We note as well that the Supreme Court was careful throughout *Hibbs* to state that it was deciding a case about the family-leave part of the FMLA; one would be hard-pressed to find anything in that opinion hinting that the ruling extended to all of § 2612(a). If, therefore, the holding in *Hibbs* should be extended to the self-care subsection, we must find comparable justification in the statute for self-care to that which persuaded the Court for family-care.

In fact, there may be reasons why Congress placed the self-leave provision at the end of the list of permissible reasons for leave that 29 U.S.C. § 2612(a) sets forth. How, for example, should pregnancy leave be characterized, when it is the woman who seeks it? In a sense, of course, it is self-care, as even in a normal, healthy pregnancy the expectant mother has personal health needs that are not shared by her male partner. In a sense, it relates to care of other(s), since the period immediately after the birth of the child is consumed not only with the mother's recovery from pregnancy, but also with round-the-clock care of the newborn baby. The *Hibbs* Court singled out maternity leave and paternity leave as an example of dissimilar treatment along gender lines, apparently because it was focusing on the risk of stereotypes that assume that only women will be effective caregivers for new offspring. For that reason, we express no opinion about the way in which a request for self-care leave submitted by a pregnant woman, for medical needs associated with her pregnancy, should be assessed for the purpose of state sovereign immunity. We note only that pregnancy discrimination (as a subset of sex discrimination) implicates a higher level of constitutional scrutiny than disability discrimination, and hence requires a different analysis.

On the other hand, although we have not conducted a statistical survey on the point, it seems obvious that the great majority of requests for self-care leave occur for exactly the kind of reason Toeller presented: that is, a short-term medical need (unrelated to pregnancy) that the individual has that must be addressed. We know of no reason why women would be more likely to have this kind of medical problem than men. Furthermore, whether we know about it is not the point in the end: what counts is that we see nothing in either the text or the legislative history of the FMLA to indicate that Congress found this to be the case.

**IV**

For these reasons, we conclude that Toeller cannot use the self-leave provision of the FMLA, 29 U.S.C. § 2612(a)(1)(D), in his suit for money damages against an arm of the State, because, like Title I of the ADA in *Garrett,* his suit cannot rest on section 5 of the Fourteenth Amendment. WDOC, as an arm of the State of Wisconsin, is entitled to invoke the State's sovereign immunity in this case, and thus the district court should have dismissed Toeller's lawsuit against it. We therefore REVERSE the judgment of the district court and REMAND for dismissal of this action.

A true Copy:

　　　　Teste:

　　　　　　　　_____
　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　*Appeals for the Seventh Circuit*