**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1168
_____

UNITED STATES OF AMERICA

v.

DESHAWN LIVINGSTON, a/k/a Shizz
DeShawn Livingston,
                                Appellant
_____

Appeal from the United States District Court
For the Middle District of Pennsylvania
(D.C. Crim. No. 09-cr-72-3)
District Judge:  Honorable Christopher C. Conner
_____

Submitted Under Third Circuit LAR 34.1(a)
September 13, 2011
_____

Before: RENDELL, JORDAN and BARRY, Circuit Judges

(Opinion Filed: September 27, 2011)
_____

OPINION
_____

BARRY, Circuit Judge

Deshawn Livingston was convicted by a jury of two counts of Hobbs Act robbery,

two counts of carrying a firearm during a crime of violence, and one count of conspiracy,

in violation of 18 U.S.C. §§ 371, 924(c), and 1951, and was sentenced to 461 months of imprisonment. On appeal, he argues that the District Court erred in denying his motion to suppress; his motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978); and his motions in limine to exclude (1) testimony regarding other robberies and (2) an in-court identification that he argues was unreliable. He also contends that the government presented insufficient evidence to the jury to show that the robberies at issue had an effect on interstate commerce and that the Court, therefore, did not have jurisdiction over the robbery and conspiracy counts.[1] We will affirm.

## I.      FACTUAL BACKGROUND

### A.      Robbery of Deborah Dobson and Omar Aquil, Sr.

On the evening of January 2, 2008, Deborah Dobson was in her home in Harrisburg recovering from cancer-related surgery. She was taking pain medication and an antidepressant, among other medications, but claimed that the drugs did not affect her ability to see, hear, or observe. She was hungry that evening and called her thirty-two-year-old son, Omar Aquil, Sr. ("Aquil"), to ask him to bring her dinner. At the time, Aquil was unemployed, and Dobson said that he "hustle[d]" to support himself, which she explained as having "a problem with drugs and alcohol." (App. at 285.)

Aquil went to Dobson's home, and on his way out the door to pick up her dinner, was stopped by two masked men, one of whom had a gun. The robbers ransacked the

---

[1] Livingston was also charged with being a felon in possession of a firearm, but that charge was dismissed on the government's motion.

home and took Dobson and Aquil with them to different floors, telling Dobson each time they moved to get down and stay covered with a blanket. They said to Aquil, "'give it up, where is it at?'" (*Id.* at 283.) From the context of the robbers' statements, Dobson believed they were looking for drugs and money. At one point, she was in her darkened living room with her face covered by a blanket, and she peeked out of the side of the blanket and saw one of the robbers in the adjacent lighted dining room "loading [his] bag up with goodies." (*Id.* at 200.) He was not wearing a mask, and was about twenty feet away from her. She saw him under those conditions for three or four minutes.

Among other things, the robbers stole flat-screen televisions, a Nintendo, an X-Box, games, fur and leather coats, cameras, and computers. Dobson said that the robbers did not take any drugs or money from her home because she was not a drug dealer, and thus no drugs or money were there.

When the police arrived at Dobson's home shortly after the robbery, she was crying and upset, and told them that she could not identify the robbers because they wore masks the whole time. She said this, she later explained, because the robbers "knew who [she] was, [she] didn't know who they were, and [she] basically feared for [her] life." (*Id.* at 221.) They took her keys to her home and car, which she was worried gave them "[a]ccess to [her] home." (*Id.* at 222.) In subsequent meetings with law enforcement about the robbery, she continued to fail to disclose that she saw one of the robbers.

At a preliminary hearing in state court a number of months after the robbery,

3

Dobson recognized Livingston as the unmasked robber she had seen in her dining room. At that hearing, Livingston was seated with his attorney at the defense table, wearing an "orange prison outfit" (*id.* at 212). Dobson did not remember whether any other defendants were in the room. Despite her recognition of Livingston, she testified under oath that she could not identify the robbers. However, shortly before trial began in this matter, two-and-a-half years after the robbery, Dobson told a law enforcement agent that she could identify Livingston. She was "[c]ertain" that Livingston was the robber she saw and stated that she would "never forget that face." (*Id.* at 205.) She said she had been "struggling with this for a very long time" and that her therapist advised her to "just tell what [she knew] just to get it over with." (*Id.* at 223.)

Livingston filed a motion in limine to exclude Dobson's identification, which the District Court denied, and she identified him at trial.

### B.    Robbery of Montaye Kitt

Livingston was convicted of a second robbery – the robbery of Montaye Kitt on February 1, 2008. At the time of the trial in this case, Kitt was serving an 11-year federal sentence for possession of crack with intent to distribute, but in February of 2008 he was living with his girlfriend in an apartment in Harrisburg. The night of the robbery, Kitt arrived home around 3:00 a.m. When he got to his apartment, two men in black masks, one of whom had a gun, jumped out and told him to "give up the money." (*Id.* at 339.) He testified that they did not ask him for drugs, but he agreed that he told the grand jury

4

that they asked for "drugs or money." (*Id.* at 353.) The robbers looked through Kitt's truck and then went back to the apartment and ransacked it. Like Dobson, he was told to lie on the floor, and they put a cover over him. The robbers stole televisions, a Playstation, computer, and even "tissue in the linen closet." (*Id.* at 341.) They also stole money out of Kitt's pocket, which he testified was not drug proceeds.

Kitt claimed that he was not engaged in drug trafficking during the period in which the robbery occurred because he was recovering from a gunshot wound at that time, but he also testified that he pled guilty to a federal drug charge that spanned the day of the robbery.

### C.      Anneliese Scherrer, the Arrest of Livingston, and the Search Warrant

On the morning of April 20, 2008, Anneliese Scherrer called the police, claiming that she had been a victim of domestic violence, and met the police officers responding to her call at a convenience store. She falsely identified herself to them as "Jasmine Williams," and told them that Livingston, her boyfriend with whom she lived, had just hit her on the face and threatened to pistol whip her. The officers noticed swelling on her face, which corroborated her story, and told her they would go to the apartment and arrest him.

Scherrer told the officers that Livingston was drunk and high on cocaine, and that he was very violent, was afraid of being robbed, and had a gun under the bed. Without being asked, she gave the officers a key to the apartment; they did not ask her for any

5

identification or proof that she lived there. One of the officers ran a background check on Livingston and discovered that he had several prior arrests for drugs and violent crimes.

The two officers who met with Scherrer were joined by three back-up officers, and they entered the apartment through the back door using Scherrer's key. One officer announced their entry and demanded several times that Livingston show himself. Livingston came out of a doorway directly in front of the officers, and an officer told him he was under arrest and to get on the floor. After standing in the doorway for several seconds, Livingston started moving to the side. An officer "amped up" his instructions to Livingston, and he eventually laid down. (*Id.* at 134.)

One officer moved in to restrain Livingston, and another officer checked the room to make sure no one else was there. There was an inflated air mattress about four to six feet away from Livingston, and when an officer kicked it, it bounced into the air, and a gun was seen. The officers testified that Livingston was in the process of being restrained, but was not yet handcuffed, when the gun was discovered.

After he was placed in the back of a police car and informed of his *Miranda* rights, Livingston told the police that "Jasmine Williams" was Scherrer's alias and that she had outstanding warrants for *her* arrest. Scherrer later called the police of her own accord, an officer met her at the apartment, and she was arrested. After her arrest, she told law enforcement that Livingston confessed to her that he had committed robberies, some of which were at issue in this case.

6

Based on information received from Scherrer regarding Livingston's robbery activity, as well as items that she said were in their apartment that matched descriptions of items stolen from Dobson and Aquil, law enforcement obtained a warrant to search the apartment. The affidavit of probable cause that supported the warrant did not, however, mention that Scherrer had initially lied to the police about her identity, had several outstanding warrants for her arrest, and gave law enforcement information about Livingston's robberies only *after* they arrested her.

The District Court denied Livingston's motion for a *Franks* hearing regarding the omissions from the affidavit of probable cause, and denied his motion in limine to preclude Scherrer from testifying about his participation in uncharged robberies.

## II.    ANALYSIS[2]

### A.    Motion to Suppress

Livingston moved to suppress the gun that was seized at his apartment during the warrantless search at the time of his arrest. He argues that the police did not have consent or another basis to justify their warrantless entry, and also contends that the search that led to the discovery of the gun under the air mattress exceeded the scope of a search incident to arrest. The District Court denied the motion to suppress as to both of these arguments. "We review the denial of a suppression motion for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the district

---

[2] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

court's properly found facts." *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006).

Law enforcement officials may search a home without a warrant when "voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citations omitted). The District Court found that Scherrer told the officers that she lived in the apartment, and that she gave them a key and said that it opened the back door. The Court did not clearly err in finding these facts, and based on them, the Court correctly held "that Scherrer had actual authority over the dwelling and consented for the officers to enter the residence." (App. at 19.)

With respect to the discovery of the gun, "[a] legitimate search incident to arrest is limited to the arrestee's person and to the area within his immediate control, meaning the area from which he might gain possession of a weapon or destructible evidence." *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (internal quotation marks omitted). The District Court found that "the [arresting] officers had reason to believe that Livingston was armed and dangerous," that he "was arrested approximately four to six feet from the location where his firearm was retrieved," and that when the officer "discovered the weapon, Livingston was not yet fully restrained." (App. at 22.) The Court also credited an officer's testimony that during the time in which Livingston was not "fully restrained," he "was 'definitely within an area where he could lunge towards a weapon.'" (*Id.* (quoting *id.* at 135).)

8

The District Court did not clearly err in any of these factual findings, and we will affirm its conclusion that the gun was discovered and seized during a legitimate search incident to arrest because it was found in an area close to Livingston before he was handcuffed.

### B.     Motion for a *Franks* Hearing

Livingston moved for a *Franks* hearing. He argued that the affidavit of probable cause that supported the search warrant for his apartment was defective because it did not disclose the facts about Scherrer's lies, her outstanding warrants, and the timing of her revelation to law enforcement – *after* her arrest – regarding his robberies. It was Livingston's burden to "make a 'substantial preliminary showing' that the affidavit contained a false statement [or omission], which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Franks*, 438 U.S. at 171). For the omission to be "material," the court must conclude "that probable cause does not exist under the corrected affidavit." *Id.* "[W]hen faced with an omission, the court must remove the falsehood created by an omission by supplying the omitted information to the original affidavit." *Id.* at 384 (internal quotation marks omitted).

The District Court held "that inclusion of the omitted information does not deprive the warrant of probable cause" because "Scherrer accurately described the unique circumstances of the offenses for which Livingston was indicted, and identified as being

9

present in Livingston's home several items reported stolen by the victims of Livingston's crimes and articles of clothing allegedly worn by Livingston during commission of the offense." (App. at 36.) Concluding that Livingston did not make a substantial preliminary showing that the omitted statements regarding Scherrer were material, the Court denied the motion for a *Franks* hearing. Because the Court based its ruling on the facts in the affidavit, we exercise plenary review over that decision. *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006).

We agree with Livingston that "[a]nyone trying to make a determination whether Scherrer was a legitimate source of information would want to know about her recent and continuous efforts to deceive the police." (Appellant's Br. at 27.) But what the magistrate judge "would want to know" is not the standard we set in *Yusuf*. The central question is instead whether, when the omitted facts are added to the affidavit, probable cause would still exist, and we agree with the District Court that it would, given the factual similarities between the reports of Dobson and Aquil, on the one hand, and Scherrer, on the other.

## C.  Motion in Limine Regarding Other Robberies

The District Court denied Livingston's motion in limine under Federal Rule of Evidence 404(b) to exclude Scherrer's testimony regarding various uncharged robberies. The Court rejected the government's contention that the other robberies were direct proof of the conduct charged in the conspiracy, but it concluded that testimony as to them was "admissible to show Livingston's motive, intent, and purpose for participating in the

10

robberies with which he is charged," as well as his "knowledge of the conspiracy, insofar as the charged and uncharged robberies were committed in similar fashion." (App. at 40-41.) We review that decision for abuse of discretion, and will reverse only if it was "clearly contrary to reason and not justified by the evidence." *United States v. Balter*, 91 F.3d 427, 437 (3d Cir. 1996) (internal quotation marks omitted).

At trial, Scherrer testified that Livingston "admitted to [her] that he was involved in multiple other robberies." (App. at 404.) She described his admissions regarding a robbery that involved a "drug dealer target," demanding drugs and money from the drug dealer's girlfriend, threats to sexually assault the girlfriend's daughter, and actually sexually assaulting the girlfriend. (*Id.* at 404-06.) She testified he told her that in another robbery a girl and her mother were told that they would be forced "to have oral sex if they didn't tell him where the drugs and money were." (*Id.* at 407.) Scherrer also said that she found a large amount of marijuana in the apartment after that robbery.

Livingston contends that the statements Scherrer attributed to him regarding these two robberies "could have been nothing more than a figment of his imagination" and that the acts she described "were never proven by the Government." (Appellant's Br. at 30.) He argues that the only reason to admit this testimony was to show that he "was a person of bad character," and that this testimony was "unfairly prejudicial." (*Id.*) But assuming, as we must, that the jury credited this testimony, that testimony was admissible to show that Livingston had, at minimum, a motive and intent to target drug dealers. There was

11

no abuse of discretion here, although the references to sexual assault and threats of sexual assault likely should have been avoided.

### D. Motion in Limine Regarding Identification

Livingston moved to exclude Dobson's identification, arguing that the procedure that resulted in the identification was unnecessarily suggestive. The District Court denied that motion, and Dobson identified him in front of the jury. We review this decision for abuse of discretion. *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006). A defendant's due process rights are violated when an identification procedure is "both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification." *Id.* There are two parts to examining whether an identification procedure is unnecessarily suggestive: (1) whether the procedure was, indeed, suggestive and (2) "whether there was some good reason for the failure to resort to less suggestive procedures." *Id.* (internal quotation marks omitted).

The District Court concluded that the identification procedure at the preliminary hearing was suggestive, but nonetheless permitted Dobson's identification testimony at trial because the procedure was not *unnecessarily* suggestive. The Court reasoned that law enforcement did not know or have any reason to believe that Dobson could identify Livingston in a setting less suggestive than at the preliminary hearing because she had consistently said that she could not identify the robbers at all. There was, therefore, a "good reason" for the failure to use less suggestive procedures. We agree with the

District Court's reasoning and conclude that the Court did not abuse its discretion.[3]

### E.    Effect on Interstate Commerce

For Livingston to be guilty of robbery under the Hobbs Act, the government must have proven, among other things, that he "in any way or degree obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). The term "commerce" is defined, among other things, as "all commerce between any point in a State . . . and any point outside thereof" ("interstate commerce"). 18 U.S.C. § 1951(b)(3).

Livingston claims that there was insufficient evidence for the jury to conclude that the two Hobbs Act robberies with which he was charged, and the associated conspiracy, affected interstate commerce. He contends that the District Court, therefore, did not have jurisdiction over those counts, and that the jury erred in convicting him. The government argues that the robberies affected interstate and international drug trade because there was evidence that Aquil and Kitt were drug dealers, and there was expert testimony that almost all of the primary illegal drugs sold in Harrisburg – heroin, cocaine, and crack, as well as marijuana for large-volume dealers – came from outside Pennsylvania.

"We will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Urban*, 404 F.3d 754, 762 (3d Cir. 2005) (internal quotation marks omitted). In this Circuit, "proof of

---

[3] We need not reach the issue of whether there was a substantial likelihood of misidentification.

13

a potential effect [on interstate commerce] is all that is required under the Hobbs Act," and that potential effect need only be "*de minimis*." *Id.* at 764, 766 (internal quotation marks omitted). Livingston does *not* claim that stealing from drug dealers is insufficient under the Hobbs Act to show an effect on interstate commerce. He argues, instead, that there was insufficient evidence for the jury to conclude that the victims of his robberies were drug dealers.

At trial, the jury heard testimony that Aquil was unemployed and supported himself by hustling, which his mother explained was "a problem with drugs and alcohol." The jury also heard Kitt admit that he pled guilty to a drug charge that spanned the date of his robbery. From this evidence, a rational juror could have concluded that Aquil and Kitt were drug dealers, and that Livingston at least attempted to rob Aquil[4] and actually robbed Kitt. Combined with expert testimony regarding the out-of-state sources for the bulk of the illegal drugs sold in Harrisburg, a rational juror could also have concluded that the robberies had a potential, *de minimis* effect on interstate commerce. There was, therefore, sufficient evidence to convict Livingston of two counts of Hobbs Act robbery, as well as conspiracy, and Livingston's jurisdictional argument fails.

---

[4] Livingston contends that there is no evidence that the items he stole from Dobson's home were connected to drugs or drug proceeds, but he was also charged with and convicted of *attempt* to commit robbery, and "[t]he Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt and conspiracy to extort" – and, by extension, to rob. *United States v. Jannotti*, 673 F.2d 578, 592 (3d Cir.1982) (en banc), most recently quoted in *United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011). There was more than sufficient evidence for a rational juror to conclude that he attempted to rob Aquil, even if the items he ultimately stole were solely Dobson's.

14

## III.   CONCLUSION

We will affirm the judgment of sentence.