The UNIVERSITY OF TEXAS
AT EL PASO, Petitioner,

v.

Alfredo HERRERA, Respondent.

No. 08–1049.

Supreme Court of Texas.

Argued March 25, 2010.

Decided July 2, 2010.

Sean D. Jordan, Assistant Solicitor General, Greg W. Abbott, Attorney General of Texas, Clarence Andrew Weber, First Assistant Attorney General, David S. Morales, Office of the Attorney General of Texas, James C. Ho, Solicitor General of Texas, Timothy Earl Bray, General Litigation Division, Austin, TX, for University of Texas at El Paso.

John P. Mobbs, John Andrew Wenke, Law Office of John A. Wenke, El Paso, TX, for Alfredo Herrera.

Justice WILLETT delivered the opinion of the Court.

This case under the Family and Medical Leave Act (FMLA) raises two important immunity issues: (1) did Congress validly abrogate Texas' sovereign immunity under the FMLA's self-care provision; and if not (2) did the University of Texas at El Paso (UTEP) waive the State's immunity through a single sentence in its Handbook of Operating Procedures? We hold that UTEP's immunity was neither validly ab-

rogated nor voluntarily waived, and the court of appeals erred in affirming the trial court's denial of UTEP's plea to the jurisdiction.

## I. Background

Alfredo Herrera worked for UTEP as a heating, ventilation, and air-conditioning technician. In March 2005 he sustained an on-the-job injury to his left elbow. Herrera took approximately nine months leave and returned to work in January 2006. UTEP terminated Herrera's employment less than one month later.

Herrera sued UTEP, claiming it fired him for (1) taking personal medical leave under the self-care provision of the FMLA and (2) exercising his First Amendment rights by complaining about unsafe work conditions. UTEP filed a plea to the jurisdiction on the FMLA claim, contending it was barred by sovereign immunity. The trial court denied the plea, and a divided court of appeals affirmed, holding the self-care provision validly abrogated the States' sovereign immunity.[1]

The court of appeals anchored its holding on the United States Supreme Court's decision in *Nevada Department of Human Resources v. Hibbs*,[2] which concerned the FMLA's *family*-care provision related to ill spouses, children or parents. The court of appeals reasoned that the self-care provision, like the family-care provision in *Hibbs*, was intended to advance equal-protection rights and was thus a valid exercise of Congress's powers under § 5 of the Fourteenth Amendment.[3] The dissenting justice emphasized that "[t]he majority

1. 281 S.W.3d 575, 585.

2. 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).

3. 281 S.W.3d at 584. Because the court of appeals held that sovereign immunity had been abrogated on this ground, it did not address the alternative argument that UTEP waived its immunity through a statement in its Handbook of Operating Procedures.

opinion flies in the face of a mountain of contrary and persuasive legal authority." [4]

## II. Discussion

### A. Does the Self-Care Provision Validly Abrogate State Immunity?

■ Congress listed five purposes underlying the FMLA:

(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;

(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition;

(3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers;

(4) to accomplish the purposes described in paragraphs (1) and (2) in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and

(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause. [5]

To achieve these purposes, the FMLA grants eligible employees [6] up to "12 workweeks of leave during any 12-month period" for various health-related reasons, [7] including an employee's "serious health condition," [8] the so-called "self-care" provision at issue in this case. Employees returning from FMLA leave are entitled to be restored to their former position, or to a new position with equivalent benefits, pay, and other terms and conditions of employment. [9]

Two threshold issues are undisputed: (1) Herrera is an "eligible employee" under the FMLA; and (2) the Act by its terms applies to state employers like UTEP. [10] Today's narrow dispute is whether Congress overreached in exposing

---

4. *Id.* at 592 (Carr, J., dissenting). Justice Carr's dissent on a material question of law gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c).

5. 29 U.S.C. § 2601(b)(1)–(5).

6. *Id.* § 2611(2)(A).

7. *Id.* § 2612(a)(1). The FMLA guarantees leave to eligible employees for the following reasons:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
(B) Because of the placement of a son or daughter with the employee for adoption or foster care.
(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

*Id.* After this case was filed, Congress added subsection (E), allowing leave for exigencies arising from a family member's active duty in the Armed Forces.

8. *Id.* § 2612(a)(1)(D).

9. *Id.* § 2614(a)(1).

10. *Id.* §§ 2611(4)(A)(iii), 203(x). The Act confers a private right of action "to recover [ ] damages or equitable relief ... against any employer (including a public agency) in any Federal or State court of competent jurisdiction...." *Id.* § 2617(a)(2).

States to FMLA claims under the self-care provision.

Our federal and state constitutional designs embody the principle of state sovereignty that shields States from private suits in their own courts and in the federal courts.[11]  Herrera's FMLA suit is thus barred by sovereign immunity unless (1) Congress validly abrogates it, or (2) the State voluntarily waives it.  As for abrogation, federal legislation can overcome the States' immunity provided Congress (1) unequivocally expresses its intent to do so, and (2) acts "pursuant to a constitutional provision granting Congress the power to abrogate."[12]  The first part is undeniable in this case;  the text explicitly subjects States to FMLA claims,[13] and the Supreme Court has determined as much.[14]  The second part is what matters here:  did Congress have constitutional authority to abrogate the States' immunity for purposes of the FMLA's self-care provision?[15]

The principal source for abrogation authority is § 5 of the Fourteenth Amendment:  "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."[16]  As the Supreme Court has explained, "Section 5 grants Congress the power 'to enforce' the substantive guarantees of § 1—among them, equal protection of the laws—by enacting 'appropriate legislation.' "[17]

■  Congress's § 5 enforcement power is not limitless, however.  If federal legislation "reach[es] beyond the scope of § 1's actual guarantees," it can validly abrogate the States' immunity only when it is "an appropriate remedy for identified constitutional violations, not 'an attempt to substantively redefine the States' legal obligations.' "[18]

■  To pass constitutional muster, § 5 legislation must meet the two-part test refined in *City of Boerne v. Flores*[19]—that is, it must (1) counter identified constitutional injuries by the States and (2) exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."[20]  The first prong decides today's case, as nothing shows Congress was thinking of gender discrimination by the States when it enacted the self-care provision.

---

11.  *See Alden v. Maine*, 527 U.S. 706, 754, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999);  *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States.");  *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex.2006);  *Hoff v. Nueces County*, 153 S.W.3d 45, 48 (Tex.2004) (per curiam).

12.  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

13.  29 U.S.C. § 2617(a)(2) (enabling employees to seek damages "against any employer (including a public agency) in any Federal or State court of competent jurisdiction");  *id.* §§ 2611(4)(A)(iii), 203(x) (defining "public agency" to include both "the government of a State or political subdivision thereof" and

"any agency of … a State, or a political subdivision of a State").

14.  *Hibbs*, 538 U.S. at 726, 123 S.Ct. 1972.

15.  *See id.*

16.  U.S. Const. amend. XIV, § 5.

17.  *Hibbs*, 538 U.S. at 727, 123 S.Ct. 1972.

18.  *Id.* at 728, 123 S.Ct. 1972 (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 88, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)).

19.  521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

20.  *Hibbs*, 538 U.S. at 728, 123 S.Ct. 1972 (quoting *City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157).

The court of appeals concluded Congress acted within its § 5 authority as the FMLA's legislative record identified unconstitutional gender bias by the States in the administration of leave benefits.[21] According to the court of appeals, Congress enacted the self-care provision to counter the stereotype that women utilize leave policies more than men and to protect women from such discrimination.[22]

The court of appeals justified its holding by pointing both to the congressional findings noted in *Nevada Department of Human Resources v. Hibbs*[23] and the historical context in which the FMLA was enacted. In *Hibbs*, which concerned the Act's family-care provision, the Supreme Court held that Congress intended the FMLA to protect a right guaranteed by the Equal Protection Clause, specifically the right to be free from gender discrimination in the workplace.[24] The Court reasoned that Congress had validly exercised its § 5 power to abrogate the States' immunity with respect to family-care claims because Congress had identified a pattern of gender discrimination on the part of the States.[25] Notably, the Court was careful throughout *Hibbs* to make clear it was deciding the narrow issue of Eleventh Amendment immunity under the family-care provision, nothing else.[26] The court of appeals pointed to *Hibbs* as proof that the Supreme Court already found that "Congress had before it sufficient evidence of gender-based discrimination in the administration of leave benefits to warrant the enactment of prophylactic § 5 legislation."[27] But all the evidence of unconstitutional State conduct cited in *Hibbs* concerned discrimination rooted in the belief that women are more likely than men to take leave to care for other family members, not themselves.[28] Indeed, the court of appeals recognized that in *Hibbs* there was evidence that the

**21.** 281 S.W.3d 575, 582.

**22.** *Id.* at 584.

**23.** 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).

**24.** *Id.* at 728, 123 S.Ct. 1972.

**25.** *Id.* at 735, 123 S.Ct. 1972 ("[T]he States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation.").

**26.** *Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 321 (5th Cir.2008); *Brockman v. Wyo. Dep't of Family Servs.*, 342 F.3d 1159, 1164 (10th Cir.2003) ("Because the Supreme Court's analysis in *Hibbs* turned on the gender-based aspects of the FMLA's § 2612(a)(1)(C), the self-care provision in subsection (D) is not implicated by that decision.").

**27.** 281 S.W.3d at 584.

**28.** *Touvell v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 422 F.3d 392, 400–01 (6th Cir.2005). *See Hibbs*, 538 U.S. at 729 n. 2, 123 S.Ct. 1972 ("Congress found that, 'due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men.'") (internal citation omitted); *id.* at 730–31, 123 S.Ct. 1972 (citing evidence of overt discrimination in the maternity and paternity leave benefits offered by both private and public employers); *id.* at 732, 123 S.Ct. 1972 (citing evidence that even facially neutral policies were applied in a discriminatory way, and noting "serious problems with the discretionary nature of family leave"); *id.* at 736, 123 S.Ct. 1972 (identifying the "impact of the discrimination targeted by the FMLA" as the "denial or curtailment of women's employment opportunities [due] to the pervasive presumption that women are mothers first, and workers second.") (internal citation omitted); *id.* at 731, 123 S.Ct. 1972 (noting "the pervasive sex-role stereotype that caring for family members is women's work").

States relied on stereotypes that women's family duties trumped their workplace duties, caring for family members is "women's work," and men do not have the same domestic responsibilities as women.[29] Such evidence regarding women taking leave to care for others does not equate to evidence regarding women taking leave to care for themselves. In *Hibbs*, the Supreme Court made clear that Congress was required to show evidence of pervasive gender discrimination by the States with regard to family leave.[30] The same is required for the self-care provision. We must assess each FMLA provision separately, and abrogation of the States' immunity under this provision must rest on its own evidentiary basis; it cannot import evidence from the family-care provision.[31] There simply is no evidence—either in Congress's findings or elsewhere in the FMLA's legislative record—that women took more personal medical leave, or were thought to, than men.[32]

The court of appeals also examined the historical context in which the FMLA was enacted,[33] concluding that Congress intentionally included the self-care provision to counter the stereotype that women take more advantage of leave policies than men and to provide women with protection from gender discrimination that might result from more-targeted legislation providing special protection only for pregnant women.[34]

29. 281 S.W.3d at 581.

30. *Hibbs*, 538 U.S. at 729, 123 S.Ct. 1972.

31. *See Touvell*, 422 F.3d at 399 n. 2.

32. *See id.* at 402, 405; H.R. Rep. No. 101–28, pt. 1, at 15 (1989) ("Recent studies ... indicate that men and women are out on medical leave approximately equally. Men workers experience an average of 4.9 days of work loss due to illness or injury per year, while women workers experience 5.1 days per year. The evidence also suggests that the incidence of serious medical conditions that would be covered by medical leave under the bill is virtually the same for men and women. Employers will find that women and men will take medical leave with equal frequency."); *see also Laro v. New Hampshire*, 259 F.3d 1, 12 (1st Cir.2001) ("The argument that [the self-care] provision validly abrogates New Hampshire's Eleventh Amendment immunity founders on this lack of congruence between the personal medical leave provision at issue here and the prevention of gender-based discrimination by states as employers, because Congress has not found the states to have engaged in the specific gender-based discriminatory practices this provision was designed to prevent."); *Bryant v. Miss. State Univ.*, 329 F.Supp.2d 818, 827 (N.D.Miss.2004) ("There is no indication that women require more actual personal medical leave than men. Nor is there any evidence that women have suffered disparate treatment due to a false perception that they require more personal medical leave than men.... [T]here is simply no evidence to this Court's knowledge that women and men have been subjected to different standards for personal medical leave."). *But see Parental and Medical Leave Act of 1987: Hearing on S. 249 Before the Subcomm. on Children, Family, Drugs and Alcoholism of the S. Comm. on Labor and Human Resources*, 100th Cong., 1st Sess., pt. 2, at 170 (1987) (testimony of Peggy Montes, Mayor's Comm'n on Women's Affairs, City of Chicago) ("[M]ost workplaces have not yet adjusted to meet the needs of the increasing number of women in the labor force.... The lack of uniform parental and medical leave policies in the workplace has created an environment where discrimination is rampant.").

33. 281 S.W.3d at 582.

34. *Id.* at 584. The court of appeals surmised the self-care provision was enacted to meet a perceived need not addressed by Title VII and the Pregnancy Discrimination Act (PDA). *Id.* at 583. The Pregnancy Discrimination Act of 1978 amended Title VII to prohibit sex discrimination on the basis of pregnancy by amending the definition of the terms "because of sex" or "on the basis of sex" to include pregnancy, childbirth, and related medical conditions. *See* 42 U.S.C. § 2000e(k). Under the PDA, women may not be treated different-

This argument suffers from myriad flaws. First, there is no evidence that Congress, when it enacted the FMLA, was any more concerned with providing leave benefits to pregnant women than to all medically eligible employees, no matter their gender.[35] Second, there is no indication the self-care provision was designed to combat workplace discrimination arising from pregnancy-related complications, much less a pattern of such discrimination by the States.[36] Third, there is no reason to believe the self-care provision would in fact remove any disincentive to hire wom-en that might otherwise result from a pregnancy-specific provision.[37] Indeed, if employers are reluctant to hire women because they believe women might become pregnant, or because they believe women take personal leave more frequently than men, then mandating twelve weeks of leave will only reinforce such views and make employers even *more* disinclined to hire women.[38]

In sum, the legislative record reveals no intention by Congress to remedy unconstitutional gender discrimination through the self-care provision.[39] Nothing links

---

ly in employment because of conditions related to pregnancy or childbirth. But the PDA does not require pregnancy-related leave by employers who offer no benefit provisions for leave at all. The court of appeals believed that the PDA had an unintended negative impact on women's opportunities in the workplace because "employers might find it cost-effective to discriminate against married women of child-bearing age." 281 S.W.3d at 583 (quoting S.Rep. No. 102–68, at 73 (1991)).

**35.** *Touvell*, 422 F.3d at 404. The self-care provision allows for personal medical leave when a "serious health condition" prevents any employee from performing his or her job. 29 U.S.C. § 2612(a)(1)(D). And the term "serious health condition" in the self-care provision is not limited to or focused on those health conditions wholly or predominantly experienced by female workers, but rather is broadly defined to include any "illness, injury, impairment, or physical or mental condition" that involves "inpatient care" at some type of medical facility or "continuing treatment by a health care provider." *Id.* § 2611(11); *Touvell*, 422 F.3d at 403 ("[T]he same Senate Report that lists various pregnancy-related conditions as examples of medical conditions that would be covered under the self-care provision also lists thirteen other types of conditions, including heart conditions, strokes, 'most cancers,' and accidents on or off the job."). *See* S.Rep. No. 103–3, at 29, 1993 U.S.C.C.A.N. 3, at 31 (1993); *see also, e.g., id.* at 12, 1993 U.S.C.C.A.N. at 14 (citing testimony that a quarter of all cancer survivors face "some form of employment discrimination").

**36.** *Touvell*, 422 F.3d at 404.

**37.** *Id.*

**38.** *See Kazmier v. Widmann*, 225 F.3d 519, 528 (5th Cir.2000), *overruled in part by Hibbs*, 538 U.S. 721, 123 S.Ct. 1972 ("[W]e find it virtually impossible to conceive how requiring employers to permit employees to take 12 weeks of leave for serious health conditions could possibly have the effect of preventing sex discrimination in *hiring practices*. If the United States is correct in surmising that employers are reluctant to hire women for fear that they will become pregnant and 'leave the labor market,' then the only possible effect on hiring practices of expressly mandating leave for pregnancy (among other serious health conditions) would be to *reinforce* such fears and make employers even *more reluctant* to hire women. A provision mandating that employers grant leave for serious health conditions cannot be viewed as reasonably calculated to achieve the objective of making employers less disinclined to hire women.").

**39.** In this context, we consult the congressional record to discern whether Congress validly abrogated the States' immunity. *See Hibbs*, 538 U.S. at 729, 123 S.Ct. 1972 ("We now inquire whether Congress had evidence of a pattern of constitutional violations on the part of the States in this area."); *Kimel*, 528 U.S. at 88, 120 S.Ct. 631 ("Our task is to determine whether the [statute] is in fact just such an appropriate remedy or, instead, merely an attempt to substantively redefine the States' legal obligations with respect to age discrimination. One means by which we

that provision to any pattern of sex-role stereotyping by the States as employers.

have made such a determination in the past is by examining the legislative record containing the reasons for Congress' action."); *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) ("[F]or Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct. [The statute] failed to meet this test because there was little support in the record for the concerns that supposedly animated the law."); *Kazmier*, 225 F.3d at 524–25 ("[W]e examine ... the legislative record of the statute under review to see whether it contains evidence of *actual constitutional violations by the States* sufficient to justify the full scope of the statute's provisions. The respect that must be accorded the States as independent sovereigns within our federal system prevents Congress from restraining them from engaging in constitutionally permissible conduct based on nothing more than the mere invocation of perceived constitutional bogeymen.... If Congress fails to include in the legislative record of a prophylactic statute any evidence of a significant pattern of unconstitutional discrimination by the States, then the statute will not be held to abrogate the States' sovereign immunity.") (footnotes, brackets, internal quotation marks omitted). It merits mention that this record-intensive inquiry, mandated by controlling caselaw, is unlike our ordinary statutory-construction cases, where clear text is determinative and leaves no room for legislative history.

40. *Lizzi v. Wash. Metro. Area Transit Auth.*, 384 Md. 199, 862 A.2d 1017 (2004); *Nicholas v. Attorney Gen.*, 168 P.3d 809 (Utah 2007).

41. *See Laro*, 259 F.3d at 16 ("[T]he personal medical leave provision of the FMLA does not exhibit a sufficient congruence to the prevention of unconstitutional state discrimination to validly abrogate the states' Eleventh Amendment immunity."); *Hale v. Mann*, 219 F.3d 61, 69 (2d Cir.2000) ("There is no evidence that this conferment of federally protected [self-care] leave is tailored to remedy sex-based employment discrimination.... Thus, we find that Congress did not have the authority to abrogate the sovereign immunity

We agree with two States' highest courts,[40] and nine federal circuit courts,[41]

of the states on claims arising under the [self-care provision] at issue here. Its attempt to do so was not congruent or proportional to the harms targeted by the Fourteenth Amendment."); *Banks v. Court of Common Pleas FJD*, 342 Fed.Appx. 818, 821 (3d Cir.2009) (per curiam) ("In *Chittister v. Dep't of Cmty. and Econ. Dev.*, 226 F.3d 223, 229 (3d Cir. 2000) we ruled that Congress did not validly abrogate the states' Eleventh Amendment immunity when it enacted provisions of the FMLA. Although the 'family-care' provisions of the FMLA were upheld by the Supreme Court in [*Hibbs*], private suits still may not be brought against states where the self-care provisions of the Act are implicated."); *Nelson*, 535 F.3d at 321 ("[W]e agree with the rationale of the Sixth, Seventh, and Tenth Circuits that the Supreme Court's ruling in *Hibbs* applies only to subsection C. Therefore, this court's decision in *Kazmier* still remains the law of this circuit with respect to subsection D."); *Touvell*, 422 F.3d at 402 ("Congress adduced no evidence of a pattern of discrimination on the part of the states regarding leave for personal medical reasons sufficient to permit the abrogation of state sovereign immunity."); *Toeller v. Wis. Dep't of Corr.*, 461 F.3d 871, 879 (7th Cir.2006) ("We know of no reason why women would be more likely to have [a short-term] medical problem than men. Furthermore, whether we know about it is not the point in the end: what counts is that we see nothing in either the text or the legislative history of the FMLA to indicate that Congress found this to be the case."); *Miles v. Bellfontaine Habilitation Ctr.*, 481 F.3d 1106, 1107 (8th Cir.2007) ("The district court properly dismissed with prejudice Miles's FMLA claim, which was brought under FMLA's self-care provisions. As an agency of the state of Missouri, the Center is entitled to Eleventh Amendment immunity from the claim.") (citations omitted); *Brockman*, 342 F.3d at 1164–65 ("The legislative history does not, however, identify as the basis for subsection (D) a link [to] any pattern of discriminatory stereotyping on the part of the states as employers."); *Batchelor v. S. Fla. Water Mgmt. Dist.*, 242 Fed.Appx. 652, 653 (11th Cir.2007) (per curiam) (unpublished) ("Our holding in *Garrett* that Congress is without authority to abrogate state sovereign

that Congress lacked the power to invoke its § 5 abrogation power under the self-care provision.[42] Although Congress did cite evidence, detailed in *Hibbs*, of pervasive stereotyping about women as family caregivers, that evidence does not extend to the Act's *self*-care provision. There is no evidence of similar stereotypes when it comes to *personal* medical leave; the legislative record in fact demonstrates the contrary—that men and women take leave equally.[43]

In fact, the record indicates two motivations underlying the self-care provision, both unrelated to gender discrimination.

First, Congress was trying to alleviate economic burdens borne by employees and their families facing health-related job loss.[44] Second, Congress was trying to curb discrimination against any employee with a "serious health condition," a term broadly defined to include *any* "illness, injury, impairment, or physical or mental condition" [45] that involves "inpatient care" at a medical facility or "continuing treatment by a health care provider," not just those health conditions wholly or mostly experienced by women.[46] Nothing in the record connects these two, gender-neutral motivations to unconstitutional workplace

---

immunity for claims arising under the self-care provision of the FMLA.").

**42.** *Nelson*, 535 F.3d at 321.

**43.** *See supra* note 32.

**44.** S.REP. No. 103-3, at 11, 1993 U.S.C.C.A.N. 3, at 13–14 (1993) ("The fundamental rationale for [a personal medical leave] policy is that it is unfair for an employee to be terminated when he or she is struck with a serious illness and is not capable of working. Job loss because of illness has a particularly devastating effect on workers who support themselves and on families where two incomes are necessary to make ends meet or where a single parent heads the household."); H.R.REP. No. 101-28, pt. 1, at 23 ("The temporary medical leave requirement is intended to provide basic, humane protection to the family unit when it is most in need of help. It will also help reduce the societal cost born[e] by government and private charity."); *see also Touvell*, 422 F.3d at 401 ("One purpose of [the self-care provision] was alleviating the economic burdens on employees and their families of illness-related job loss."); *Brockman*, 342 F.3d at 1164 (same); *Laro*, 259 F.3d at 12 ("Attention to the legislative history reveals that Congress's primary motivation for including the personal medical leave provision contained in subsection (D) was to protect families from the economic dislocation caused by a family member losing his or her job due to a serious medical problem.").

In any event, this concern implicates the Commerce Clause rather than § 5 of the Fourteenth Amendment, and Congress cannot abrogate the States' immunity through the Commerce Clause. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 364, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

**45.** 29 U.S.C. § 2611(11).

**46.** *See, e.g.*, S.REP. No. 103-3, at 12, 1993 U.S.C.C.A.N. 3, at 14 (citing testimony that a quarter of all cancer survivors face "some form of employment discrimination" and that "such discrimination against qualified employees costs society millions of dollars in lost wages, lost productivity and needless disability payments"); H.R.REP. No. 101-28, pt. 1, at 23 ("[A] worker who has lost a job due to a serious health condition often faces future discrimination in finding a job which has even more devastating consequences for the worker and his or her family."); *see also Touvell*, 422 F.3d at 401 ("The other purpose of the self-care provision was to prevent employment discrimination against those with serious health problems."); *Brockman*, 342 F.3d at 1164 ("The legislative history accompanying the passage of the FMLA reveals two motivations for the inclusion of the self-care provision.... Second, Congress was attempting to prevent those with serious health problems from being discriminated against by their employers.") (citations omitted); *Laro*, 259 F.3d at 12 ("A secondary motivation that appears in the legislative history is a concern to protect workers who were temporarily disabled by serious health problems from discrimination on account of their medical condition.").

injuries inflicted by the States. Similarly, the congressional finding most germane to the self-care provision makes no male-female distinction, stating "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." [47]

Because the self-care provision was not intended to combat gender bias by the States, and thus does not satisfy *City of Boerne*'s first prong, we need not reach prong two regarding congruence and proportionality. Summing up: Congress exceeded its § 5 abrogation authority when it subjected the States to private-damages suits under the FMLA's self-care provision.

### B. Does UTEP's Personnel Handbook Waive the State's Immunity?

■ Herrera alternatively argues that even if Congress did not abrogate the State's immunity, UTEP clearly and unambiguously waived it through its Handbook of Operating Procedures, which states "[a]n eligible employee may also

bring a civil action against an employer for violations [of the FMLA]." We disagree.

UTEP's policy manual certainly mentions employees' FMLA rights, noting that the FMLA makes it unlawful to discharge or discriminate against someone for involvement in proceedings under the Act. The handbook also includes the "may also bring a civil action" sentence, which Herrera says plainly permits FMLA claims.

This cursory language does not remotely constitute voluntary consent to suit, much less "clear and unambiguous" consent.[48] Putting aside the issue of whether UTEP (as opposed to the Legislature) can waive its immunity by declaration in a handbook,[49] UTEP's manual actually reveals nothing about an intent to waive immunity.[50] The handbook states that employees may sue for violations of the FMLA, but makes no attempt to expand the universe of actionable violations by explicitly waiving immunity that UTEP otherwise enjoys. Indeed, it is impossible to grasp how fleeting language in a policy manual can "clearly and unambiguously" waive immunity when far more overt declarations in statutes enacted by the Legislature fall short.[51]

---

**47.** 29 U.S.C. § 2601(a)(4).

**48.** *See Tooke v. City of Mexia*, 197 S.W.3d 325, 328–29 & n. 2 (Tex.2006) (noting that sovereign and governmental immunity are "waived only by clear and unambiguous language").

**49.** *See Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 853 (Tex.2002) ("This Court has long recognized that 'it is the Legislature's sole province to waive or abrogate sovereign immunity.'" (quoting *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex.1997))); *but see Tooke*, 197 S.W.3d at 344 ("[I]t could be argued that a city lacks authority to waive its own immunity from suit by ordinance or charter. But we need not address that argument here because the quoted provision is not a clear and unambiguous waiver of immunity."); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375, 377

(Tex.2006) (noting that "[w]e have generally deferred to the Legislature to waive immunity," but holding that City was not immune from "claims against it which are germane to, connected with and properly defensive to claims the City asserts").

**50.** *See Tooke*, 197 S.W.3d at 342 (holding that a ten-word sentence that revealed nothing about an intent to waive immunity did not waive City's immunity from suit).

**51.** *Id.* (holding that phrases in Texas statutes stating a governmental entity may "sue and be sued" or "plead and be impleaded" were not clear and unambiguous waivers of sovereign immunity within the meaning of Tex. Gov't Code § 311.034); *see also id.* at 347–55 ("Appendix" listing Texas statutes containing "sue and be sued" or "plead and be impleaded" language).

### III. Conclusion

The State of Texas cannot be sued under the FMLA's self-care provision. As for abrogation, nothing in the legislative record suggests that gender bias by the States was the constitutional evil underlying the self-care provision. Congress's power under the Fourteenth Amendment to overcome the States' immunity is limited, and its attempt to do so here was an unconstitutional exercise of its § 5 power. As for waiver, a stray line in UTEP's policy manual that employees may "bring a civil action against an employer" is insufficient to waive state immunity. The trial court erroneously denied UTEP's plea to the jurisdiction. We reverse the court of appeals' judgment and dismiss Herrera's FMLA claim for lack of subject-matter jurisdiction.

Justice LEHRMANN did not participate in the decision.