IN THE SUPREME COURT OF TEXAS
 
════════════
No. 10-0245
════════════
 
Patrick O. Ojo, On 
Behalf of Himself and
All Others Similarly Situated, 
Appellant
 
 
v.
 
Farmers Group, Inc., Fire 
Underwriters Association,
Fire Insurance Exchange, 
Farmers Underwriters Association,
and Farmers Insurance 
Exchange, Appellees
 
════════════════════════════════════════════════════
On Certified Question from the United 
States
Court of Appeals for the Ninth 
Circuit
════════════════════════════════════════════════════
 
 
Argued October 14, 
2010
 
 
            
Chief Justice 
Jefferson, concurring.          

            

            
Legislative history is not always a villain. It is central to the process 
by which the Legislature enacts the laws that govern society. Yet a statute’s 
pedigree is not itself law. For that reason, this Court usually applies a 
text-centric model when it construes a statute. We look first to the text. When 
the text is not clear, we explore extrinsic aids, including legislative history. 
See, e.g., City of Rockwall v. Hughes, 246 
S.W.3d 621, 626 (Tex. 2008). That we have reached some methodological 
agreement,[1] even if inconstant,[2] is itself impressive, particularly in 
light of the difficulties other courts have experienced when attempting to 
accomplish this same task.[3] Textualism is 
easy to advocate. The difficulty lies in its implementation.
            
We start with the text because it is the best indication of the 
Legislature’s intent. See Fresh Coat, Inc. v. K-2, 
Inc., 318 S.W.3d 893, 901 (Tex. 2010) (“Our ultimate purpose when construing 
statutes is to discover the Legislature's intent. Presuming that 
lawmakers intended what they enacted, we begin with the statute's text, relying 
whenever possible on the plain meaning of the words chosen.” (citations and quotations omitted)). Thus, when we can 
interpret a statute by reference to its language alone, we generally do so. 
Id. In this way, we mean to avoid sacrificing a clear textual command to 
conflicting language in an extrinsic, non-authoritative source.[4] The animating principle behind this 
standard is a reluctance to use legislative history to interpret a clear 
statute. Accordingly, our cases consistently tie a discomfort with extrinsic 
aids to the language of construction. See City of Rockwall, 246 S.W.3d at 
626 (“When a statute's language is clear and unambiguous, it is 
inappropriate to resort to rules of construction or extrinsic aids to 
construe the language.” (emphasis added));[5] see also Entergy Gulf States, Inc. v. 
Summers, 282 S.W.3d 433, 437 (Tex. 2009) (“Therefore, our practice when 
construing a statute is to recognize that the words [the Legislature] 
chooses should be the surest guide to legislative intent. Only when those words 
are ambiguous do we resort to rules of construction or extrinsic aids.” (alteration in original; emphasis added; quotations and 
citations omitted)).
            
Our general rule, then, is that extrinsic aids are inappropriate “to 
construe” an unambiguous statute. And while the Court today does cite several 
pieces of legislative history, none are used to construe the relevant statute, 
and thus the Court follows our standard practice. Indeed, the Court states that 
its construction is based on the statute’s language: “The Texas Insurance Code 
is void of any language creating a cause of action for a racially disparate 
impact.” ___ S.W.3d at ___. The Court’s opinion could 
begin and end with those nineteen words, just as our Constitution, without the 
Federalist Papers, has a first and last word. We engage in a larger 
discourse, however, because it is useful to understand what options were 
available when our representatives in government enacted policy.[6]
            
An appellate opinion is not a mere recitation of legal standards and 
conclusions. It is that, to be sure, but it is also, perhaps more 
importantly, one part of a dialogue between parties, citizens, legislators, and 
judges—a dialogue that provides a historical record of the relevant controversy. 
Even where our decision is purely legal, it begins with an account of the case’s 
facts—the story of how the case arose, and how it came to be in front of us. 
Many times, we could give our conclusions of law without reference to any of 
this, but we choose to include this “extraneous” information because it gives 
context to our decision, making it more approachable to our readers and more 
easily integrated into our social fabric. In this sense, we as judges act as 
storytellers and historians.[7]
            
We tell these stories because doing so is crucial to our legitimacy. Our 
judgments carry with them a threat of state authority.[8] As justification for the coercive impulse 
behind our decisions, we give not only a conclusion but also a narrative,[9] by which we seek to legitimize our 
decision by placing it in historical context, demonstrating that it is 
consistent with our notions of justice—and, indeed, that it comports with the 
state of the law.
            
When used in this contextual manner, there is little reason to think 
legislative history inappropriate for citation.[10] An exhortation 
that extrinsic sources never be cited for any purpose gives such 
sources too much power and judges too little credit. A legislative report, for 
example, frequently will provide useful information about the period in which 
the statute was enacted.[11] It can give the reader some indication 
of why an issue was before the Legislature, and this information is 
useful as context even where it is irrelevant to the specific act of 
interpretation.[12] This “why” may not be important to the 
result, but it is important to readers—both lay and expert—and the 
Legislature,[13] all of whom look to our opinions as a 
complete and fair recording of the case’s circumstances. Nothing we do is in a 
vacuum, and our readers care about more than mere results—background is given 
not because it controls, but because it contextualizes.[14] And, of course, we as judges frequently 
make decisions in light of other extraneous information that could, in 
some circumstances, bear on our decisionmaking. If we 
are trusted to make fair decisions despite recitations of sympathetic or 
compelling facts, why should we not also be trusted to give fair interpretations 
despite looking to legislative history for general background? There is no 
justification for placing one enormous, useless hole in our consideration of a 
case’s history. That this information can be useful in a non-interpretive manner 
is well-demonstrated by the fact that all but one justice, aware of and in 
agreement with our methodological principles, nonetheless join today’s opinion. 
This is not inconsistency; it is a recognition that 
commitment to the text is not a commitment to blind ourselves to otherwise 
useful information solely because of its source.
            
So what does the Court’s survey of legislative history tell us today? The 
Court makes no attempt to construct the statute’s meaning by looking at its 
history. Instead, it gives us information that, while not essential to our 
interpretation of the Insurance Code, is far from irrelevant: “The legislative 
history of the credit scoring bill and the arguments of its opponents indicates 
that the Texas Legislature was aware of the possibility of a disparate impact on 
racial minorities, yet did not expressly provide for a disparate impact claim as 
it did in the Texas Labor Code.” ___ S.W.3d at ___. 
Thus, we are told that the statute says what it says because the Legislature 
intended that meaning.[15] This fact has no bearing on our 
interpretation, and we would interpret clear language the same regardless of 
whether or not the Legislature had given thought to the specific issue before 
us. The inclusion of this history gives notice to those who feel wronged by the 
statute. The remedy they seek requires engagement in the political process, on 
the legislative battlefield. Moreover, it gives those same aggrieved citizens 
some indication of why the Legislature would have made the choice that it 
did, allowing them to hone their advocacy. For those who support the statute, 
this language’s relevance is much the same. This guidance will not harm 
democracy, our reputation, or the bar, and indeed it may help.                                                     

 
 
                                                                        
___________________________________
                                                                        
Wallace B. Jefferson,
Chief Justice
 
 
OPINION DELIVERED: May 27, 
2011







[1] 
One scholar has described methodological 
agreements of this type as “methodological stare decisis,” which is the “practice of giving precedential 
effect to judicial statements about methodology.” See Abbe R. Gluck, The States 
as Laboratories of Statutory Interpretation: Methodological Consensus and the 
New Modified Textualism, 119 Yale L.J. 1750, 1754 
(2010).

[2] 
See 
id. at 1789 (noting that, compared to the Court 
of Criminal Appeals, the Texas Supreme Court is “inconsistent but often reaches 
the same result, albeit more diplomatically”).

[3] 
See 
id. at 1765 (“[T]he U.S. Supreme Court is simply not in the 
practice of picking a single interpretive methodology for statutes. Indeed, the 
Court does not give stare decisis effect to any 
statements of statutory interpretation methodology.”); Nicholas Quinn Rozenkranz, Federal Rules of Statutory 
Interpretation, 115 Harv. L. 
Rev. 2085, 2144 (2002) (noting that the Supreme Court “do[es] not seem to treat 
methodology as part of the holding”).

[4] 
The Supreme Court most infamously did this in 
Church of the Holy Trinity v. United States, 143 U.S. 457 (1892), when it 
ignored the text of a statute on the basis of a Congressional report and its 
beliefs about the statute’s general purpose. This decision has been frequently 
criticized. See, e.g., Antonin Scalia, 
Common-Law Courts in a Civil-Law System, in A Matter of Interpretation 19 (Amy 
Gutmann, ed. 1997) (deriding the Court’s “utterly 
inexplicable” reasoning); Adrian Vermeule, 
Interpretive Choice, 75 N.Y.U. L. 
Rev. 74, 84 (2000) (“[T]he Supreme Court blundered badly in [Holy 
Trinity] by incautiously equating the contents of a Senate committee report 
with Congress’s intention. In fact, the committee report proved highly misleading . . . .”).

[5] 
We have relied on this language from Rockwall 
multiple times. See Molinet v. Kimbrell, 54 Tex. Sup. Ct. J. 491, 
493(Jan. 21, 2011); Tex. Lottery Comm’n 
v. First State Bank of DeQueen, 325 
S.W.3d 628, 637 (Tex. 2010).

[6] 
And we engage in this wider discourse regularly. 
In 2010 alone, we repeatedly cited legislative history absent a finding of 
ambiguity. For example, in Robinson v. Crown Cork & Seal Co. Inc., 54 
Tex. Sup. Ct. J. 71, 72-90(Oct. 22, 2010), we delved deeply into legislative 
history despite finding no statutory ambiguity, looking even to floor statements 
and defeated amendments. Similarly, in Klein v. Hernandez, we cited 
legislative history, noting, without regard to questions of ambiguity, that it 
was a proper subject for consideration in statutory interpretation. 
Klein, 315 S.W.3d 1, 6 (Tex. 2010) (“The cardinal rule of statutory 
construction is to ascertain and give effect to the Legislature’s intent. When 
determining that intent, the Code Construction Act further guides our analysis, 
listing a number of relevant factors including . . . legislative 
history . . . .” (citation 
omitted)). See also Franka v. 
Velasquez, 332 S.W.3d 367, 381 n.66 (Tex. 2011) (finding no statutory 
ambiguity, but citing and quoting at length Michael S. Hull, et al., House 
Bill 4 and Proposition 12: An Analysis with Legislative History, Part Three, 
36 Tex. Tech. L. 
Rev. 169, 290-93 (2005)); Tex. Comptroller 
of Pub. Accounts v. Atty. Gen. of Tex., 54 Tex. 
Sup. Ct. J. 245, 255 (Dec. 3, 2010) (finding no ambiguity, but citing, for 
background and contextual information, Office of Consumer Credit, Legislative Report 
Reviewing Identity Theft and Senate Bill 473 (2004)); Univ. of Tex. v. 
Herrera, 322 S.W.3d 192, 198 n.39 (Tex. 2010) (citing legislative history to 
determine “whether Congress validly abrogated the State’s immunity” because that 
inquiry is “mandated by controlling caselaw”); City 
of Waco v. Kelley, 309 S.W.3d 536, 548 (Tex. 2010) (despite not finding 
ambiguity, noting that “[n]othing in the current 
language of the statute or the legislative history indicates legislative intent 
to change the disciplinary options that were originally available to the 
commission in cases of indefinite suspension”); City of Dallas v. Abbott, 
304 S.W.3d 380, 384-85 (Tex. 2010) (citing legislative history absent a finding 
of statutory ambiguity).

[7] 
Cf. Oliver Wendell Holmes, The 
Common Law 5 (2005) (“The life of the law 
has not been logic: it has been experience. The felt necessities of the time, 
the prevalent moral and political theories, intuitions of public policy, avowed 
or unconscious, even the prejudices which judges share with their fellow-men, 
have had a good deal more to do than the syllogism in determining the rules by 
which men should be governed.”). See also Interview by Bryan A. Garner 
with Chief Justice John G. Roberts, in Washington, D.C. (Mar. 2, 2007), 
available at 
http://legaltimes.typepad.com/files/garner-transcripts-1.pdfhttp://legaltimes.typepad.com/files/garner-transcripts-1.pd 
(“Every lawsuit is a story. I don’t care if it’s about a dry contract 
interpretation; you’ve got two people who want to accomplish something, and 
they’re coming together—that’s a story.”) (all Internet 
materials as visited May 25, 2011 and copy available in Clerk of Court’s 
file).

[8] 
Max Weber famously described the state as “the 
form of human community that . . . lays 
claim to the monopoly of the legitimate physical violence within a particular 
territory.” Max Weber, Politics as a Vocation, in The Vocation Lectures 33 (David Owen 
& Tracy B. Strong, eds., Rodney Livingstone, trans. 2004). This principle 
also applies to the courts, the arm of the state tasked with interpreting the 
law. Our pronouncements are therefore law, and the law is enforced through the 
threat of the state’s authority; thus, one scholar notes that “legal 
interpretation is as a practice incomplete without violence—because it depends 
upon the social practice of violence for its efficacy.” Robert 
M. Cover, Violence and the Word, 95 Yale L.J. 1601, 1613 (1986). 
Indeed,
 
Legal interpretation takes place in a field of pain and 
death. . . . Legal interpretive acts signal and occasion the 
imposition of violence upon others: A judge articulates her understanding of a 
text, and as a result, somebody loses his freedom, his property, his children, 
even his life.
 
Id. at 1601.

[9] 
Cf. Robert M. Cover, The 
Supreme Court, 1982 Term—Foreword: Nomos and 
Narrative, 97 Harv. L. Rev. 
4, 5 (1983) (“[L]aw and narrative are inseparably related. Every prescription is 
insistent in its demand to be located in discourse—to be supplied with history 
and destiny, beginning and end, explanation and purpose. And every narrative is 
insistent in its demand for its prescriptive point, its moral.” (footnote omitted)).

[10] See 
Jonathan T. Molot, The Rise and Fall of 
Textualism, 106 Colum. L. Rev. 1, 38-39 (2006) 
(“Legislative history may or may not have any bearing on the outcome of the 
case, even when it is considered. . . . [I]n some circumstances even 
textualists themselves will look to legislative 
history. Of course they will not use it to try to construct the intent of a 
statute’s authors. That is precisely the offense that textualism has been rallying against for decades. But textualists will sometimes use legislative history to gain a 
background understanding of the problems Congress was trying to address.” (citations omitted)).

[11] For example, 
in United States v. Fausto, 484 U.S. 439, 
444-45 (1988), Justice Scalia, writing for the Court, cited a Senate Report as 
evidence of a statute’s purpose. See also Yule Kim, Cong. Research Serv., 97-589, 
Statutory Interpretation: General 
Principles and Recent Trends 42 (2008) (“Reference to legislative history 
[in judicial opinions] for background and historical context is 
commonplace.”); Christian E. Mammen, 
Using Legislative History in American Statutory Interpretation 189 (2002) 
(“But other kinds of information may also be found in legislative history: 
factual information about the historical and political context in which the 
statute was debated and ultimately enacted, expert analysis about the issues 
implicated by the statute, and even contextual linguistic usage.”); Norman J. Singer & J.D. Shambie Singer, 
Sutherland on Statutory Construction § 48:1 (7th ed. 2007) 
(“Extrinsic aids consist of background information about circumstances which led 
to the enactment of a statute, events surrounding enactment, and developments 
pertinent to subsequent operation.”).

[12] See 
Cass R. Sunstein, Interpreting Statutes in the Regulatory 
State, 103 Harv. L. Rev. 407, 
431 (1989) (“Legislative history has in fact provided a valuable sense of 
context in a number of recent cases.”).

[13] The Code 
Construction Act expressly gives courts permission to consider legislative 
history even in the absence of statutory ambiguity. Tex. Gov’t Code § 311.023(3). Thus, a 
court never acts illegally when it considers legislative history, and to the 
extent that we believe that history usually should not be considered when 
construing a clear statute, that belief is the result of pragmatic 
considerations—a recognition that extrinsic aids will 
usually be a less reliable guide to legislative intent than the words the 
Legislature used. But a standard based on pragmatism does not benefit from 
pronouncements of universality.

[14] See 
Mammen, 
supra note 11, at 102 (“[D]iscovering the context in which the statute was enacted 
seems to be an integral part of the rationale for using extrinsic 
materials . . . .”); Robin Kundis 
Craig, The Stevens/Scalia Principle and Why It Matters: Statutory 
Conversations and a Cultural Critical Critique of the Strict Plain Meaning 
Approach, 79 Tul. L. Rev. 
955, 979 (2005) (“[A]llowing courts to consult 
statutory history, legislative history, and administrative history . . . allows courts to contextualize 
statutory language.”); John F. Manning, Textualism as a Nondelegation Doctrine, 97 Colum. L. Rev. 673, 702 (1997) (“In their search for context, 
textualist judges routinely draw interpretive insights 
from sources outside the statutory text.” (footnote omitted)).

[15] Even Justice 
Scalia would permit reference to legislative history when it is not used to give 
meaning to statutory terms. Thus, in Green v. Bock Laundry Mach. Co., 490 
U.S. 504 (1989), Justice Scalia concurred in the result but wrote separately to 
criticize the majority for consulting legislative history to “determin[e] what, precisely, the” text at issue meant. 
Id. at 528 (Scalia, J., concurring). But his opposition to legislative 
history was not without limits, and rather focused only on the link between 
extrinsic sources and construction:
 
I think it entirely appropriate to consult all public 
materials, including the background of [the statute] and the legislative history 
of its adoption, to verify that what seems to us an unthinkable disposition . . . was indeed unthought of . . . .
 
Id. at 527; 
see also Sunstein, 103 Harv. L. Rev. at 431 n.96 (“In Bock . . . all the members of 
the Court . . . agreed that the legislative history helped to reveal 
that literalism would lead to inadvertent absurdity. . . . 
Indeed, even Justice Scalia acknowledged the usefulness of history here . . . .”); Manning, 97 Colum. L. Rev. at 702 (noting that 
elements of Justice Scalia’s interpretive philosophy “require[] judges to resort to extrinsic sources in 
determining statutory meaning”). Today, the Court engages in exactly this sort 
of use, consulting historical sources to show that the Legislature was aware of 
what it was doing.